UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IBRAHIM KIRA,

                    Plaintiff,                    Case Number 09-10683
                                                  Honorable David M. Lawson
v.

ARAB COMMUNITY CENTER FOR
ECONOMIC AND SOCIAL SERVICES,

                    Defendant.
_____/

## OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Plaintiff Ibrahim Kira, a limited license psychologist, filed a complaint under the Age Discrimination in Employment Act (ADEA) and the Michigan Elliott Larsen Civil Rights Act alleging that the defendant, Arab Community Center for Economic and Social Services (ACCESS) terminated his employment as a therapist and supervisor on account of his age. Presently before the Court is the defendant's motion for summary judgment, in which it alleges that the undisputed facts show that the plaintiff voluntarily left his employment to take a better-paying job once he learned of the defendant's intended reorganization, and the defendant had a legitimate, non-discriminatory reason for reorganizing that resulted in the change in the plaintiff's employment status. The plaintiff says that he started looking for other employment when he was told his position would change with the reorganization, and the reorganization itself was a pretext for discrimination, since it resulted only in the departure of the plaintiff and one other therapist/supervisor, both of whom were seventy years old. The Court finds that although there is evidence in the record which supports the defendant's contentions, the plaintiff has come forward with contrary evidence and has established a jury-submissible claim. Therefore, the Court will deny the motion for summary judgment.

I.

The plaintiff was employed as a psychologist by defendant ACCESS from January 1995 through March 2008. He is an English- and Arabic-speaking limited-license therapist who was seventy years old at the time he left the defendant's employ. According to the defendant, the plaintiff began his employment as a therapist, but he was given a supervisory role sometime in 2005, and his client-contact duties gave way to supervisory duties as time went by. In fact, the defendant contends that by the end of the plaintiff's tenure, he had reduced his own caseload so that he was seeing only one patient every two days. By 2005, the plaintiff was reporting to Dr. Mohammed Farrag, the clinical director of the defendant's department of community health and research. Dr. Farrag reported to the executive director, Dr. Adnan Hammad. Dr. Farrag also apparently had reduced his patient contact. Dr. Hammad determined that a reorganization was necessary to lower the ratio of therapists to patients, improve the level of services, and control costs. He envisioned a "flat structure" in which every licensed therapist would carry a patient load. In pursuit of that reorganization, the defendant contends that Dr. Hammad persuaded Dr. Farrag, who also was seventy years old, to relinquish his clinical director position and become a consultant. That agreement was a never completed and Dr. Farrag left ACCESS in January 2008. Dr. Hammad approached the plaintiff with a similar objective. The parties' versions of the ensuing conversations, which are set forth below, are not the same.

The plaintiff provides a different history. He says that his employment at ACCESS always had a supervisory component, and he maintained his level of patient contact throughout his entire tenure there, except when he was given additional grant-writing duties by Dr. Hammad. The plaintiff testified that the standard work allocation for a full-time therapist was 60-65% direct patient

work and 35-40% administrative, and for a supervisor 50% supervision, 32% direct patient contact, and 18% administrative.  When Dr. Hammad assigned the plaintiff to do research and write grants for ACCESS over the last two years of the plaintiff's employment, the plaintiff reduced his caseload to avoid neglecting his patients, a decision that was approved by Dr. Hammad.  No one ever complained about the quality of the plaintiff's work; to the contrary, both parties agree that the plaintiff did his job quite well.

The plaintiff met with Dr. Hammad and Michele Wells, the defendant's human resources director, on July 20, 2007 to discuss the plaintiff's position in light of Dr. Hammad's planned reorganization.  The parties offer different versions of the conversation.  According to the defendant, the plaintiff had told Dr. Hammad that he did not want to see patients any longer and preferred to focus his work on research and grant writing.  Dr. Hammad contends that he said that the plaintiff could step out of his current position and remain at ACCESS in his capacity through January 1, 2008 while the defendant looked for a replacement.  Thereafter, the plaintiff would be given an ongoing position as an independent contractor writing grants and doing research.  The terms of that position remained open to negotiation.

The plaintiff testified that at the meeting, Dr. Hammad told him about planned changes in the organization so that Hammad could bring in "new blood . . . to be able to carry the next generation."  Pl.'s Ans. to Mot. Summ. J., Ex. 3, Kira dep. at 10-11.  The plaintiff contends that he was told he would not have a job after January 1, 2008, but he would be offered work on a contract basis after he resigned, funded only from the proceeds of successful grant applications he would write.  The plaintiff insists that Dr. Hammad made no mention of having to restructure for budgetary reasons.  He says he was never offered another position at ACCESS.  He explained that he did not

-3-

want to retire and he would begin to look for another job if the defendant did not offer him a

position.

Following the meeting, Michele Wells sent the plaintiff a letter apparently to summarize the

discussion.  The letter states:

> . . . After long evaluation and thought . . . we are requesting that you resign your
> positions as Supervisor, Children's Programs, Community Mental Health Division.
>   It is a known fact that you possess great skill and expertise in a variety of areas.
> We invite you to have open dialogue with us as we negotiate re-positioning you
> within the [organization] capitalizing on your skill of grant writing, research and
> evaluation, [sic]  please be assured that we are open to discuss [sic] regarding the
> details of your transition.

Mot. Summ. J., Ex. 2.  The plaintiff was encouraged to be "open minded and positive as we work

through this process."  *Ibid.*  Wells set out the following schedule:

> 1.     Effective Monday, July 23, 2007, ACCESS will announce to the staff that we
>        will be recruiting for a Supervisor of the Children's Program, CMH Division.
> 2.     Human resources will begin recruiting for this position immediately.  Dr.
>        Kira has agreed to assist in interviewing as well as mentoring and training
>        candidates of interest.
> 3.     Anticipated date of having a new supervisor on board, trained and ready to
>        lead, is January 1, 2008.  At this time, Dr. Kira will begin serving, officially,
>        under the terms and in the capacity as negotiated.  Negotiations of Dr. Kira's
>        newly acquired capacity will be finalized by January 1, 2008 and become
>        effective beginning immediately thereafter.  Negotiations will be facilitated
>        by Dr. Hammad . . . and . . . Michele Wells.

*Ibid.*

The plaintiff remained in his position as the supervisor of the Children's Program with the

same salary and benefits until November 28, 2007.  Until then, neither party raised the issue of the

plaintiff's new position.  Each side blames the other for this lapse.  The plaintiff began looking for

another job; he applied to the Georgia Center for Torture and Trauma Survivors (CTTS) for their

-4-

director position on September 21, 2007, writing that he was leaving ACCESS for "advancement." Mot. Summ. J., Ex. 6, p. 2.

On November 28, 2007, Dr. Hammad and Ms. Wells met with the plaintiff for the second time. Both parties have described this meeting as basically a rehash of the earlier meeting, with the plaintiff agreeing to stay in his position until March 1, 2008 because the defendant had not yet found a qualified replacement candidate. The defendant sent a follow-up letter to the plaintiff that was similar to the July 20 letter, with the revised termination date, noting that "Dr. Kira will remain on ACCESS payroll in his present capacity with all associated benefits until March 1, 2008." Mot. Summ. J., Ex. 3. After the second meeting, neither party initiated discussions about the new arrangement for the plaintiff.

Some time during fall 2007, another position opened at ACCESS for the director of the Clubhouse, a day program for chronically mentally ill patients. The defendant says that the plaintiff never expressed any interest in or applied for this position. The plaintiff explains that he was interested in the position, but did not want to "beg" for jobs after being informed that ACCESS no longer wanted him as an employee. Mot. Summ. J., Ex. 4, pl.'s dep., at 79, 121-124. This position was filled by a Clubhouse employee before the plaintiff left ACCESS.

On February 7, 2008, the plaintiff received a job offer from the Georgia CTTS, which he accepted, starting March 17, 2008. The defendant seems to believe that the plaintiff was actually hired earlier and supplies the payroll records to support this point. However, these exhibits provide no clear evidence of a hiring date. The defendant also notes that the plaintiff signed a lease in Atlanta on February 12, 2008. The defendant states that it first learned of the plaintiff's new job at a February staff meeting. Dr. Hammad testified that he was surprised by this revelation, but happy

-5-

for his friend and colleague because the CTTS job was "ten times more important than the job [Dr. Kira] had at ACCESS" and he believed that the plaintiff "should not really take [the] risk in refusing [that job] easily."   Mot. Summ. J., Ex. 1, Hammad dep., at 182-83).

The plaintiff's last day at ACCESS was March 1, 2008.  His colleagues attended a company-sponsored farewell party for him.  On March 3, 2008, Dr. Hammad sent an email to the Executive Director stating, "This is to let you know that I let Dr. Kira go last Friday; it went very peaceful and nice."  Pl.'s Ans. to Mot. Summ. J., Ex. 5.  On March 16, 2008, the plaintiff received a layoff notice from the ACCESS Human Resources Department, which stated, "It is with much regret that we are unable to continue your employment effective March 16, 2008.  This was a difficult decision and comes as a result of the position requirements and requisition."  Ans. to Mot. Summ. J., Ex. 6.

After the plaintiff left ACCESS, the defendant faced a supervisory problem and moved Abdullah Ali, a 55-year-old therapist and supervisor in the adult program, to the acting supervisor role for the children's program as well.  The defendant argues that although the plaintiff was qualified for the position, Dr. Ali's more patient-focused practice was preferred for the supervisor position.  Dr. Ali continues in this position because ACCESS has been unable to find a suitable candidate with the necessary credentials and language skills.

The plaintiff filed a complaint against ACCESS on February 23, 2009, asserting claims under both the federal ADEA, 29 U.S.C. § 621 *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2202 *et seq.*  The defendant filed a motion for summary judgment on November 11, 2009 and, following the plaintiff's response and the defendant's reply, the Court heard brief oral argument on January 13, 2010.

-6-

II.

The defendant presents two main arguments. First, understanding that there is no direct evidence of discrimination, the defendant contends that the plaintiff cannot prove a *prima facie* case because the plaintiff was never fired. The defendant's take on the evidence is that the plaintiff ignored the offer to negotiate a new job arrangement and instead left ACCESS for a better – and better paying – position. The defendant believes that the only way the plaintiff can show adverse action by his employer given the circumstances of his departure is to prove constructive discharge, which cannot be found in these facts. Second, the defendant argues that there is no circumstantial evidence that age was the reason the plaintiff separated from ACCESS. The defendant says that of the two jobs not given to the plaintiff after July 2007, one (the Clubhouse director position) he never applied for, and the other (the supervisory position he vacated) was not awarded until after he left voluntarily, and then it was assigned only on an interim basis.

The plaintiff refutes the first point with his own testimony and documentation from the defendant's files, which discuss "let[ting] [the plaintiff] go," and "eliminat[ing]" his position. He states that the July 20, 2007 letter makes clear that as of the first of the year, he no longer had a job as an employee with ACCESS, despite the invitation to negotiate other arrangements. He says that age was the motivating factor behind the restructuring, as shown by the elimination of the two older therapists and the retention of younger department heads. The plaintiff also insists that the defendant's claim of restructuring is pretextual, since Dr. Hammad has given several inconsistent justifications for it, and the true reason was betrayed by the explanation furnished at the July 20, 2007 meeting that ACCESS wanted "new blood" in the organization.

The standards for evaluating a motion for summary judgment are well known but bear repeating here.  As the Sixth Circuit recently explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits."  Fed. R. Civ. P. 56(a), (b).  Such a motion presumes the absence of a genuine issue of material fact for trial.  The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts.  *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).  Once that occurs, the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).  In addition, when "'reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. . . . Thus, the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the non-moving party.'"  *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citations omitted)); *see also Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("In evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'") (quoting *PDV Midwest Refining, LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

The Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, makes prohibits employers from discriminating against covered employees on the basis of age:

-8-

> It shall be unlawful for an employer–
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1).  "Congress enacted the ADEA 'to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment.'"  *Pistillo v. Comm'r*, 912 F.2d 145, 150 (6th Cir. 1990) (quoting 29 U.S.C. § 621(b)).

In order to prevail, the plaintiff must provide sufficient facts that would allow a reasonable jury to conclude that ACCESS fired him.  "He also must produce 'direct, indirect, or circumstantial evidence that [his] age was a factor in the decision to terminate [him] and that 'but for' this factor [he] would not have been terminated.'  *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314-15 (6th Cir. 1989), *citing Chappell v. GTE Products Corp.*, 803 F.2d 261, 265-66 (6th Cir. 1986)."  *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246 (6th Cir. 1997) (alterations in original).

"ELCRA claims are analyzed under the same standards as federal ADEA claims.  *See Blair* [*v. Henry Filters, Inc.*], 505 F.3d [517,] 523 [(6th Cir. 2007)] (analyzing ADEA and ELCRA claims "together" under the same standards in a work force reduction case)."  *Geiger v. Tower Automotive*, 579 F.3d 614, 626 (6th Cir. 2009).  To make out a claim of age discrimination under the Elliott-Larsen statute, a plaintiff must produce evidence that she suffered an adverse employment action and that age was a determining factor in the employer's decision.  *See Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 697, 568 N.W.2d 64, 69 (1997).

A.  Adverse Action

The Sixth Circuit has held that "[a]n adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote,

-9-

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998)), *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007). Not every action taken by an employer that potentially affects an employee rises to the level of an adverse employment action. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 796 (6th Cir. 2004). Employer actions that are a "mere inconvenience or an alteration of job responsibilities" are not "enough to constitute an adverse employment action." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004).

To prove adverse employment action, the plaintiff must demonstrate a "materially adverse change in the terms or conditions of [his or] her employment because of [his or] her employer's conduct." *Kosis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (internal citations and quotation marks omitted). "An employer's decision to discharge an employee is a classic example of an adverse employment action." *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007). Other examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, or other indices that might be unique in a particular situation." *Kosis*, 97 F.3d at 886 (internal citations and quotation marks omitted).

The defendant contends that it took no adverse action against the plaintiff. Instead, it argues that the plaintiff left voluntarily to pursue a better job without determining the conditions of the independent contractor position offered him at ACCESS. Dr. Hammad testified that Dr. Kira was not laid off and that "[w]e had an open, an open discussion and an open relationship with Dr. Kira and we never finalized that relationship." Mot. Summ. J., Ex. 1, Hammad dep. at 124. Hammad

testified that "Dr. Kira divorced the relationship," *id.* at 170; "I was not thinking of Dr. Kira to be

laid off from the organization," *id.* at 206-07.  The defendant also argues that Dr. Kira was not fired;

rather his position was eliminated.  The defendant argues that it did not want to fire Dr. Kira and it

expressed interest in retaining him as an independent contractor.   Finally, in its October 6, 2008

position statement to the EEOC, the defendant describes the facts as follows:

> Dr. Adnan Hammad, the Director of the ACCESS Community Health and Research
> Center, Mr. Abdallah Boumediene, the Operations Manager of the Center, and
> Michelle Wells, the Director of Human Resources for ACCESS, met with Dr. Kira
> for a period of ten months over how those changes [in the Commission of the
> Accreditation of Rehabilitation Facilities (CARF) standards] would affect Dr. Kira.
> These officers informed Dr. Kira that if he stayed on staff, he would have to assume
> supervisory duties, while continuing to be a therapist at the clinic. They specifically
> offered Dr. Kira a new position with these duties, which Dr. Kira declined on the
> stated basis that he was "getting tired" and did not want to make such a major
> change.
>
> The officials listed above then offered Dr. Kira a full-time or a part-time consulting
> contract under which he would receive full benefits and salary for a period.  As they
> explained, this would be a job in which he would be writing grants and reviewing
> files, rather than seeing patients.  Dr. Kira again declined, stating that he was "tired,"
> that his wife was ill, that he was considering moving to Atlanta, and that he wanted
> to explore other options.
>
> Dr. Kira then stated he wanted to retire.  ACCESS accepted his resignation but
> advised him that it would lay him off instead so that he could collect unemployment
> benefits.

Ans. to Mot. Summ. J., Ex. 8, EEOC Position Statement.

The plaintiff denies that he was offered a supervisory position.  He has presented evidence

that he was asked for his resignation several times, including at both meetings with Dr. Hammad and

Ms. Wells and in both follow-up letters.  The letters plainly stated that he would no longer have a

job as of January 1, extended to March 1, 2008.  Dr. Hammad acknowledged in his deposition that

"[w]e did request that Dr. Kira resign from his position as a supervisor for the children [sic] mental

health program because the . . . position was eliminated." Ans. to Mot. Summ. J., Ex. 7, Hammad

dep. at 101. Dr. Hammad also authored an email to his supervisors informing them that he had "let

Dr. Kira go." Ans. to Mot. Summ. J., Ex. 5. In addition, the defendant sent the plaintiff a Notice

of Layoff.

The Court believes that there is sufficient evidence of adverse employment action so that "'a

jury could reasonably find for the plaintiff.'" *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 605

(6th Cir. 2006) (quoting *Anderson*, 477 U.S. at 252). There is no doubt that the defendant sought

to change its relationship with the plaintiff. At the time, the plaintiff enjoyed a full-time, salaried

position, and the defendant wanted to change that to an independent contractor, pay-as-you-go

relationship. The details of the independent contractor position remain unclear; neither party made

an effort to pursue the idea. However, the evidence suggests that one feature of the new relationship

contemplated by Dr. Hammad was that the plaintiff would lose the security of a fixed salary and

benefits to be replaced by an arrangement in which his compensation was determined by the success

of his grant writing. The plaintiff also would no longer be the supervisor of the children's program

at the defendant's community mental health division. Those differences amount to "a significant

change in employment status, such as . . . reassignment with significantly different responsibilities,

or a decision causing a significant change in benefits," *White*, 533 F.3d at 402 (internal quotation

omitted), or "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, or other indices that might be unique in a particular situation," *Kosis*, 97

F.3d at 886.

B. Illegal motive

At the summary judgment stage, the plaintiff must offer some evidence that the defendant took the adverse employment action against the plaintiff "because of [his] age." 29 U.S.C. § 623(a)(1). "A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence." *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009) (citing *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008)). Last term in *Gross v. FBL Financial Services, Inc.*, --- U.S. ---, 129 S. Ct. 2343, 2350 (2009), the Supreme Court held that the language of the ADEA leaves no room for mixed motive cases. The Court reiterated the following standard of proof: "To establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Ibid.* (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. ---, ---, 128 S. Ct. 2131, 2141-42 (2008), and *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63-64 & n.14 (2007). The Sixth Circuit has held, however, that the application of the familiar *McDonnell-Douglas* framework to determine whether the plaintiff has offered sufficient circumstantial proof of illegal motive at the summary judgment stage remains unaffected by *Gross*. *Geiger*, 579 F.3d at 622.

Under the *McDonnell Douglas* framework, *see McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the plaintiff first must establish a *prima facie* case, whereupon the defendant must offer a legitimate reason for its actions. If the defendant does so, the plaintiff cannot proceed unless he offers some evidence that the defendant's proffered justification is a pretext for unlawful discrimination. See *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1997).

A *prima facie* case requires proof that the plaintiff: 1) was a member of a protected class (age 40 to 70); 2) suffered an adverse employment action perpetrated by the defendant; 3) was qualified

-13-

for the position held; and 4) was replaced by someone outside of the protected class. *See Geiger*, 579 F.2d at 622-23 (citing *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008) (citing *Minadeo v. ICI Paints*, 398 F.3d 751, 764 (6th Cir. 2005)); *Browning v. Dep't of Army*, 436 F.3d 692, 695 (6th Cir. 2006). The fourth component also can be established by showing that the plaintiff "was treated differently from similarly situated employees outside the protected class." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004). To be "outside the protected class," the comparator should be substantially younger than the plaintiff. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.")).

At seventy years of age, the plaintiff falls within the intended scope of protection of the ADEA. *See* 29 U.S.C. § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."). This Court has determined that the defendant took adverse action against him, and there is no dispute that Dr. Kira was qualified for the job that was taken from him. The defendant argues that the plaintiff cannot show that he was treated less favorably than substantially younger individuals because there was a job opening in the Clubhouse for which the plaintiff failed to apply, and the plaintiff's own job never saw a permanent replacement before he left for his new job in Georgia, although the temporary occupant, at age 55, is substantially younger than the plaintiff.

The defendant also views the field of comparison very narrowly. It argues that comparators must be limited to "supervisors [who] had over the course of the preceding year reduced their patient

-14-

load to seeing one patient every two days . . . or one patient per week." Def.'s Reply Br. at 4. That limitation is too severe. "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (citations and internal quotation marks omitted). To be "similarly situated," employees generally must "have dealt with the same supervisor" and "have been subject to the same standards." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). The Sixth Circuit has cautioned, however, that district courts "should not assume . . . that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Consequently, the law in this Circuit is that a plaintiff must show only "that the comparable employee is similar 'in all of the *relevant* aspects.'" *Martin*, 548 F.3d at 412 (quoting *Ercegovich*, 154 F.3d at 352); *see also Geiger*, 579 F.2d at 622-23 (collecting cases).

The plaintiff points out that he was treated differently than the other program supervisors who reported to Dr. Farrag. None of the other supervisors were affected by the reorganization, except Dr. Ali and Dr. Wasi who took over the plaintiff's position and duties in addition to their own when ACCESS could not find a suitable replacement. The only other employee fired was Dr. Farrag, the other seventy-year-old member of that department. Coincidence could be at work here, but at the very least the evidence is sufficient to establish the fourth component of a *prima facie* case.

-15-

The defendant has proffered a couple reasons for its action: the need to restructure and to address the declining caseload of some of its therapists. The plaintiff therefore must offer some evidence of pretext. In this Circuit, proof of pretext has been organized around three general propositions: "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (quoting *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). The plaintiff contends that the defendant's proffered reasons are not worthy of belief because it has offered multiple and contradictory explanations for eliminating the plaintiff's position. The plaintiff also argues that the need to reorganize was not the real reason the plaintiff was fired from his salaried position.

The defendant's stated reasons for separating the plaintiff have not been consistent throughout the EEOC and court proceedings. As the plaintiff points out in his brief, in the defendant's position statement to the EEOC, the defendant asserted that "the Commission of the Accreditation of Rehabilitation Facilities (CARF)[] changed its standards for accreditation to require that psychologists or psychiatrists have a specific patient load, that they supervise other staff members (including managers and therapists), and that they participate in the submission of grants." Ans. to Mot. Summ. J., Ex. 8. The defendant explained that it "had no choice but to realign its job duties and responsibilities in accord with the CARF standards." *Ibid.* However, Dr. Hammad testified at his deposition that "[t]here is no relationship between CARF standards and accreditation and the restructuring of ACCESS Community Mental Health . . . . there was no relationship between the two. Two different issues, completely different issues." Ans. to Mot. Summ. J., Ex. 7, Hammad dep. at 211-12. The position statement represented that the plaintiff was told that if he continued

-16-

in his job, he would have to take on additional supervisory duties, and the plaintiff declined the offer of a job because he was "getting tired" and did not want the new responsibilities.  Ans. to Mot. Summ. J., Ex. 8.  In his deposition, Dr. Hammad testified that no one had made the plaintiff an offer of another job that involved supervisory duties.  In its position statement, the defendant justified its actions to the EEOC on the ground that the plaintiff had resigned or retired, but Dr. Hammad acknowledged in his deposition that the plaintiff had done neither.  Dr. Hammad also testified that the change was needed to implement a "flat structure," but, according to the plaintiff, ACCESS has not followed through with those plans, there is no evidence that it ever will, and no other managers have been affected by these plans.  Dr. Hammad testified that no formal plans for the reorganization were drawn up.

The plaintiff also argues that the proffered justifications did not actually motivate the discharge.  He argues that Dr. Hammad's comment about hiring "new blood . . . to carry the next generation" demonstrates that the defendant was motivated by the plaintiff's advanced age.  "Courts examine several factors in determining whether an employer's age-related statements evince bias. These include '(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.'"  *Morgan v. N.Y. Life Ins. Co.*, 559 F.3d 425, 432 (6th Cir. 2009) (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002)).  The statements satisfy these four factors and have some evidentiary value.  Dr. Hammad is a decision-maker for ACCESS.  The statements were related to the decision-making process concerning the plaintiff's termination, since they were made during the discussion to solicit the

plaintiff's resignation.  The defendant argues that the third factor favors disregarding the statement because "new" does not necessarily mean "younger."  However, when used in the context of the phrase "for the next generation," a fair inference is that ACCESS was looking to hire younger therapists who could relate to younger patients.  The remark was part of a larger discussion about the plaintiff's termination and the future of the clinical programs at ACCESS.  Within this context, a reasonable inference from this statement is that the defendant wanted to hire a younger individual.

In addition, the plaintiff also has offered evidence that Dr. Farrag, the only other employee over seventy in the clinical division, was the only other person asked to resign, and none of the other managers were affected.  Finally, the plaintiff argues that the defendant replaced him with Dr. Ali, a fifty-five year old supervisor in the adult program.  It appears that Dr. Ali took over the plaintiff's position and is performing the same tasks the plaintiff performed.  There is no evidence in the record that the defendant changed the job duties.  The defendant argues that Dr. Ali is more qualified because his therapeutic approach is more patient-driven.  Perhaps, but the evidence that the plaintiff was replaced by a younger individual allows an inference of illegal motive.

There is sufficient evidence in the record to permit the case to proceed further.

### III.

The Court finds that issues of material fact preclude summary judgment.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt #22] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  January 22, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 22, 2010.

s/Teresa Scott-Feijoo
TERESA SCOTT-FEIJOO